IN THE UNITED STATES DISTRICT COURT
FOR THE SOUHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BAKER HUGHES INCORPORATED | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 4:15-CV-2675 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
|     Defendant. | § | |

## MEMORANDUM AND ORDER

This is a dispute over a disallowed income tax deduction. Although the parties to this litigation are an American company and the U.S. Government (for taxes collected on its behalf by the Internal Revenue Service), the facts giving rise to the claim involve a Russian subsidiary company and the Russian Ministry of Finance. Pending before the court are the parties' cross motions for summary judgment seeking a determination whether a payment made by a U.S. parent company, through a Cypriot entity, to a Russian subsidiary is deductible either as a bad debt (Dkts. 29 & 31[1]) or as an ordinary and necessary business expense (Dkts. 43 & 44).

## BACKGROUND

The following facts are largely undisputed.[2] During the relevant time period, BJ Services Company ("BJ Parent") was the parent company of an affiliated group of corporations and subsidiaries throughout the world. Through a series of foreign and domestic holding companies, BJ Parent conducted fracking services in Russia through a

---

[1] At oral hearing on February 23, 2018, Plaintiff Baker Hughes Incorporated requested leave to file a formal motion for summary judgment on its bad debt claim. Because a separate motion would only restate the same arguments Baker Hughes made in response to defendant's motion, the Court denied plaintiff's request noting, instead, it would consider plaintiff's response (Dkt. 31) as its motion.

[2] Except where noted, the parties agree on the facts relevant to the issues raised in this matter. The disagreement between the parties is over the legal effect of those facts.

Russian subsidiary, ZAO Samotlor Fracmaster Services ("BJ Russia"). (Dkt. 29-2, 21-4). Plaintiff, Baker Hughes Incorporated, is the successor to BJ Parent.

In August 2006, BJ Russia contracted with OJSC TNK-Management ("TNK-BP"), a joint venture between a Russian company and British Petroleum. (Dkt. 44, p. 5). Under the contract, BJ Russia agreed to provide pressure pumping services to TNK-BP in the Siberian oil fields. (*Id.*). The agreement guaranteed a minimum number of jobs for BJ Russia over the three years of the contract at a fixed rate, and was valued at approximately $44 million. (*Id.* at p. 6; depo of Brett Wells, Dkt 44-3, p. 14). The contract required BJ Parent to extend a "performance guarantee:" if BJ Russia was unable to perform all of its obligations under the contract, BJ Parent would, upon demand by TNK-BP, be responsible to perform or to take whatever steps necessary to perform, as well as be liable for any losses, damages, or expenses caused by BJ Russia's failure to complete the contract. (Dkt. 29-6).

The contract was not as profitable as BJ Russia had forecast, and it sustained net losses in 2006 and 2007. (Dkt. 44, p. 9). In September 2008, BJ Russia informed TNK-BP that it would not renew the contract and would exit the Russian market at the conclusion of the contract in 2009. (Dkt. 44, p. 9; depo. of Brett Wells, Dkt. 44-3, p. 32). On October 21, 2008, the Russian Ministry of Finance sent a letter to BJ Russia advising the company it was in violation of articles 90 and 99 of the Civil Code of the Russian Federation and in danger of forced liquidation. (Dkt. 44-14). Those provisions require a joint stock company to maintain "net assets" in an amount at least equal to the company's

chartered capital. (Dkt. 44-14). A company may reduce its chartered capital to match the level of its net assets, but the Civil Code sets a minimum level for chartered capital. If, at the end of year, the net assets fall below that minimum level, the company must be liquidated. (Dkt. 44-14).

The Ministry of Finance informed BJ Russia that, by its calculations, the company's net assets cost for 2006 was -228,277,00 Rubles, and -570,683,000 Rubles for 2007. Since the net assets cost were below the chartered capital minimum,[3] the Russian tax authority had the right to liquidate the company through the courts, a point it repeated three times in the letter. (Dkt. 44-14). The company was given until November 14, 2008 to "improve [the company's] financial performance and increase the net assets." (Dkt. 44-14). BJ Parent considered this to be a credible threat, and analyzed the ramifications if BJ Russia was liquidated. (Dkt. 44, p. 10-11). It believed that if BJ Russia was liquidated, TNK-BP would force BJ Parent to finish the contract pursuant to the Performance Guarantee, and BJ Parent would have to pay a third party to complete the work. (Dkt 44, 11-12). BJ Parent estimated its potential exposure exceeded $160 million, and worried about the potential damage to its reputation if one of its subsidiaries defaulted. (Dkts. 44, p. 12; 44-18).

On November 13, 2008, BJ Russia assured the Ministry of Finance that it was "taking steps to improve the financial and economic activities of the company and to increase the net assets in 2008." (Dkt. 29-9). After considering the options available in the

---

[3] There is no evidence of the minimum chartered capital amount. However, since BJ Russia's net asset costs were negative, it is evident the net assets were less than the minimum chartered capital, whatever the amount.

limited time given, BJ Parent chose to transfer funds from BJ Parent to BJ Russia under article 251(11) of the Tax Code of the Russian Federation, Federal law No. 117-FZ. (Dkt. 43-2). That provision allows a majority shareholder to transfer assets to a company without tax consequences for the receiving company. (Dkt. 43-2, 8-9). To comply with the statute, it was necessary to change the ownership structure of BJ Russia from two owners with equal shares of stock to a single majority shareholder. (Dkt. 43, p. 6). BJ Holding (Russia) Limited sold 1,050 shares of BJ Russia stock to a Cypriot entity, Samotlor Holding Limited, making Samotlor the majority shareholder of BJ Russia. (Dkt 43-2).

Samotlor then signed an agreement to provide "Free Financial Aid" in the amount of $52 million to BJ Russia. (Dkt 44-15). The funds would be transferred by BJ Parent, on behalf of Samotlor, by December 31, 2008. (Dkt. 44-15). It was agreed that the "stated cash assets shall be used by the Company to execute its activities as stipulated by the Company's Charter" and that Samotlor "confirms hereby that its financial assistance is free and that it does not expect the company to return the funds to the shareholder." (*Id.*). BJ Parent then made a series of transfers in amounts between $2,000.00 and $6,000.00 to BJ Russia.[4] (Dkt. 44-16). BJ Parent (now Baker Hughes Incorporated) claimed a deduction on its tax return of $52 million, but that deduction was disallowed by the IRS. Baker Hughes now seeks a refund of $17,654,000 in federal income taxes it paid on the $52 million, plus interest. Baker Hughes contends the payment is deductible as a bad debt

---

[4] The money was transferred in smaller increments because of a concern that a lump sum transfer of $52 million might be held up by the bank. (Depo. of Brett Wells, Dkt. 44-3, p. 42).

4

under Section 166 of the Tax Code, or as an ordinary and necessary trade or business expense under Section 162. *See* 26 U.S.C. §§ 162 and 166.

## ANALYSIS

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is genuine if the evidence could lead a reasonable jury to find for the nonmoving party. *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).

If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)). If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *Id*. at 255. Where, as here, the evidentiary facts are not disputed, a court may grant summary judgment if trial would not enhance its

ability to draw inferences and conclusions. *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978).

1. Section 166 – Bad Debt

Baker Hughes contends the $52 million payment to BJ Russia is deductible under Section 166(a), which applies to "any debt which becomes worthless within the taxable year." 26 U.S.C. § 166(a) (1). It argues that courts have defined the term "debt" broadly, and have allowed payments that were made to discharge a guarantee to be deducted as bad debt losses. Baker Hughes further insists that Treasury Regulation § 1.166-9 allows it to deduct this payment because "a payment of principal or interest made . . . by the taxpayer in discharge of part or all of the taxpayer's obligation as a guarantor . . . is treated as a business debt becoming worthless in the taxable year in which the payment is made." *Id.* Baker Hughes argues that it made the payment to discharge its obligation to guarantee performance on the BJ Russia contract, and therefore satisfies this regulation. Baker Hughes' argument proceeds as follows:

1) The Russian Ministry was threatening to liquidate BJ Russia because it did not have sufficient capital;

2) Liquidation of BJ Russia would have caused it to default on the contract with TNK-BP);

3) That default would have made TNK-BP a judgment-creditor and BJ Russia a judgment-debtor;

4) BJ Russia would have been obligated to pay TNK-BP a fixed and determinable sum of money potentially in excess of $160 million;

6

5) BJ Parent guaranteed BJ Russia's performance, creating a creditor-debtor relationship between them and making BJ Parent liable for BJ Russia's debts; and

6) The payment to BJ Russia satisfies the debt created by BJ Parent's performance guarantee, and BJ Russia's inability to repay renders it a bad debt under IRC § 166.

Baker Hughes' arguments conflate two questions: 1) did BJ Parent pay a debt owed by BJ Russia to TNK-BP because it guaranteed that obligation; or 2) did the transfer of money by BJ Parent (through the shareholder company) to BJ Russia create a debt owed by BJ Russia to BJ Parent. The answer to both these questions is no.

A taxpayer is entitled to take as a deduction any debt which becomes worthless in that taxable year. 26 U.S.C. § 166(a)(1). The Treasury regulations clearly state that a contribution to capital cannot be considered a debt for purposes of 26 U.S.C. §166. 26 C.F.R. § 1.166–1(c) (1983). The question of whether the payment from BJ Parent to BJ Russia is deductible in the year made "depends on whether the advances are debt (loans) or equity (contributions to capital)." *Stinnett's Pontiac Service, Inc. v. Commissioner of Internal Revenue,* 730 F.2d 634, 638 (11th Cir. 1984). "Articulating the essential difference between the two types of arrangement that Congress treated so differently is no easy task. Generally, shareholders place their money 'at the risk of the business' while lenders seek a more reliable return." *Slappey Drive Ind. Park v. United States*, 561 F.2d 572, 581 (5th Cir. 1977). In order for an advance of funds to be considered a debt rather than equity, the courts have stressed that a reasonable expectation of repayment must

exist which does not depend solely on the success of the borrower's business. *American Processing and Sales Co. v. United States,* 371 F.2d 842, 856 (Ct.Cl. 1967).[5]

It is clear that the advances to BJ Russia were not debts, but were more in the nature of equity. There was no certificate or note evidencing a loan, no provision for or expectation of repayment of principal or interest, and no way to enforce repayment. Instead, the operative agreement stated clearly and succinctly that it was "free financial aid" and would not be paid back to BJ Parent or to Samotlor. (Dkt. 44-15). The intent of the parties was clear: it was not a loan and did not create an indebtedness. In fact, it could not be a loan because further indebtedness for BJ Russia would not have solved the net assets and capitalization problems identified by the Russian Ministry of Finance. (Depo. of Ronald Pinto, Dkt. 44-4, p. 11) (it could not be a loan "because that would increase our liabilities which would make them shut us down."). BJ Russia's undercapitalization also supports the conclusion this was an infusion of capital and not a loan that created a debt.

Baker Hughes next argues that the payment was made pursuant to a guarantee to perform because if BJ Russia was liquidated, BJ Parent would be liable for the damages caused by the breach. It is true that a guaranty payment qualifies for a bad debt deduction if "[t]here was an enforceable legal duty upon the taxpayer to make the payment." *Herrera v. Commissioner of Internal Revenue*, 544 F. App'x 592, 595 (5th Cir. 2013)

---

[5] The Fifth Circuit has identified at least thirteen factors relevant to deciding whether an advance is debt or equity: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972); *see also In re Lothian Oil, Inc.*, 650 F.3d 539, 542 (5th Cir. 2011) (noting an "11 factor test" consisting of factors 1-11).

(quoting Treas. Reg. § 1.166–9(d) (2)). However, voluntary payments do not qualify. *See* Treas. Reg. § 1.166–1(c) ("A gift . . . shall not be considered a debt for purposes of section 166."); *see also Piggy Bank Stations, Inc. v. Commissioner of Internal Revenue*, 755 F.2d 450, 452–53 (5th Cir. 1985).

Baker Hughes points to several cases in which bad debt deductions were allowed for payments made pursuant to guarantees of obligations. (Dkt. 31, p. 21). Those cases are not persuasive. It is true that BJ Parent executed a performance obligation with TNK-BP to guarantee the work would be done. However, BJ Russia never failed to perform its obligations, and TNK-BP never looked to BJ Parent to satisfy any requirements under the performance guarantee. (Depo. of Ronald Pinto, Dkt. 44-4, p. 46). The event that triggered the payment was not a demand by TNK-BP or other creditors of BJ Russia to perform, instead it was the notice from the Russian Ministry of Finance that BJ Russia was undercapitalized and at risk of being liquidated. No money was paid to TNK-BP, and no guaranteed debt or obligation was discharged by the payment.[6] Nothing in the performance guarantee legally obligated BJ Parent to give $52 million to BJ Russia, it was only required to perform on the contract if BJ Russia could not. After the money was transferred to BJ Russia, both BJ Parent and BJ Russia had the same obligations under the performance guarantee that existed before the transfer. The payment neither extinguished, in whole or in part, BJ Parent's obligation to guarantee performance, nor reduced the

---

[6] Although it is not entirely clear from the record, it appears the funds were used, at least in part, to pay some outstanding loans, at least one of which was to another subsidiary of BJ Parent. There is no evidence or contention that these loans were guaranteed by BJ Parent. However, by paying down that debt, BJ Russia reduced its liabilities and increased its net assets. (*See* depo. of Brett Wells, Dkt. 44-3, p. 50) (discussing the use of the $52 million to pay down liabilities).

damages it would pay in the event of a default. It also did not impact BJ Russia's obligations to perform; it merely reduced the risk that BJ Russia would be unable to perform due to liquidation for violation of Russian legal capitalization requirements. In short, this was not "a payment of principal or interest made . . . by the taxpayer *in discharge of* part or all of the taxpayer's obligation as a guarantor," because there was no discharge of any obligation.

Plaintiff relies heavily on the case of *Myers v. Commissioner of Internal Revenue*, 42 T.C. 195 (1964) to argue that an advance of money pursuant to a performance guarantee that allows the receiving company to complete a construction project is a debt that is deductible under Section 162. *Myers* is inapplicable to these facts. The court in *Myers* found that the taxpayer:

> made such advances as were necessary to complete the construction and to sell the houses free and clear of labor, mechanic's and materialmen's liens. Upon doing so a **debtor-creditor relations** was created under the construction contract between Cortland Homes and Myers Bros . . . even though Courtland Homes might not be able to meet its obligation to reimburse the partnership. . . . In this connection it is to be noted (notwithstanding the respondent's contentions on brief to the contrary) that the parties have in effect stipulated that the amount of the advances here in question **represented debts** owing to Myers Bros. by Cortland Homes . . . .

*Id.* at 208 (emphasis added). Here, by contrast, there was no contractual agreement between BJ Parent and BJ Russia requiring such a payment to BJ Russia or repayment by BJ Russia.[7] The terms of the payments stressed that no debtor-creditor relationship was being created because it was "free financial aid." In *Myers*, Cortland Homes, had it

---

[7] The payment was made to avoid being called to perform on the performance guarantee between BJ Parent and TNK-BP. (Depo. of Brett Wells, Dkt. 44-3, p. 37) ("We took steps to prevent there being a default underneath that contract.").

continued to exist, owed a debt to Myers Bros. in the amount of the advances that had been made. Here, because this was "free financial aid," BJ Russia owed no such debt to BJ Parent.

The other cases cited by Baker Hughes to support this contention are similarly distinguishable. In each instance, the focus was on whether payment under a performance guarantee created a debt that the payer had a legal right to be repaid. *Gillespie v. Comm'r*, 54 T.C. 1025, 1031 (1970) *aff'd. by unpublished order* 72-2 U.S. T.C. 9742 (9th Cir. 1972) ("At the outset it must be recognized that as a result of the discharge of the debenture [there] arose an obligation running from Gillespie Equipment Inc., to the petitioners."); *Justice Steel, Inc. et al. v. Commissioner*, 41 T.C. 209 (1980) (company that indemnified its directors for personal guarantees made on behalf of other companies had paid a constructive dividend to them when there was no expectation of repayment); *Matter of Vaughan*, 21 B.R. 695 (E.D. Ky. 1982) *aff'd* 719 F.2d 196 (6th Cir. 1983) ("The Court views the guaranty agreements as an indirect loan . . ."); *compare with Field & Co. v. Comm'r*, 33 T.C.M. 115 (1974) (advances to insolvent company with no expectation of being repaid and no provision for insurance was a capital contribution and not a debt). In each instance, when the payment of the guarantee gave the payer a right to be repaid, it was a debt; when the payer had no right to be repaid, it was a capital contribution. As has been noted, BJ Parent had no right to expect repayment of the funds advanced.

In summary, the advance to BJ Russia did not create a debt, did not pay a debt, and was not a payment of a debt pursuant to a guarantee. It is therefore not deductible under Section 166(a) as a bad debt.

**2.     Section 162(a) – Ordinary and Necessary Expense**

Baker Hughes argues, in the alternative, that the payment was deductible as an ordinary and necessary business expense under 26 U.S.C. § 162(a). That section of the Internal Revenue Code allows the deduction of "all the ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a). Baker Hughes contends that the free financial aid was an ordinary business expense to BJ Parent, because it fulfilled its legal obligations under the Performance Guarantee and avoided serious business consequences if its subsidiary had defaulted on the TNK-BP Contract. Among those consequences were BJ Parent's exposure to financial damages in excess of $160 million, including the loss of assets and equipment of BJ Russia, as well as severe damage to BJ Parent's reputation as a reliable service provider in the global market. (Dkt. 44, pp. 13-18).

The United States contends that, as a matter of law, BJ Parent's contribution of free financial aid to its subsidiary was neither an "expense," nor was it "ordinary." The court agrees, for reasons explained below.

As a general rule, voluntary payments by a shareholder to his corporation in order "to bolster its financial position" are not deductible as a business expense or loss.

*Schleppy v. Commissioner,* 601 F.2d 196, 197 (5th Cir. 1979), *citing Deputy v. DuPont,* 308 U.S. 488 (1940) and *Interstate Transit Lines v. Commissioner,* 319 U.S. 590 (1943).

> It is settled that a shareholder's voluntary contribution to the capital of the corporation has no immediate tax consequences. 26 U.S.C. § 263; 26 CFR § 263(a)-2(f) (1986). Instead, the shareholder is entitled to increase the basis of his shares by the amount of his basis in the property transferred to the corporation. 26 U.S.C. § 1016(a)(1). When the shareholder later disposes of his shares, his contribution is reflected as a smaller taxable gain or a larger deductible loss. This rule applies not only to transfers of cash or tangible property, but also to a shareholder's forgiveness of a debt owed to him by the corporation. . . . The rules governing contributions to capital reflect the general principle that a shareholder may not claim an immediate loss for outlays made to benefit the corporation.

*Commissioner v. Fink,* 483 U.S. 89, 94 (1987). This principle is also set out in the regulations:

> Amounts assessed and paid under an agreement between bondholders or shareholders of a corporation to be used in a reorganization of the corporation or voluntary contributions by shareholders to the capital of the corporation for any corporate purpose. Such amounts are capital investments and are not deductible.

Treas. Reg. § 1.263(a)-2(f) (1986).

In determining whether the appropriate tax treatment of an expenditure is immediate deduction or capitalization, "a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important." *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 87 (1992) (citing *Central Texas Savings & Loan Assn. v. United States,* 731 F.2d 1181, 1183 (5th Cir. 1984) ("While the period of the benefits may not be controlling in all cases, it nonetheless remains a prominent, if not predominant, characteristic of a capital item.")).

Moreover, to qualify for deduction, the expense involved must be ordinary and necessary for the taxpayer's own business. As a general rule, a taxpayer may not deduct the expenses of another. *See Welch v. Helvering,* 290 U.S. 111, 114 (1933) ("Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily."); *Deputy v. Commissioner,* 308 U.S. 488, 495 (1940) ("[T]he fact that a particular expense would be an ordinary or common one in the course of one business and so deductible under [§ 162(a)] does not necessarily make it such in connection with another business.").

As the government correctly observes, the circumstances giving rise to BJ Parent's free financial aid to its subsidiary bear none of the hallmarks of an 'expense.' BJ Parent was under no obligation to make this payment to BJ Russia but chose to do so to avoid potential future losses. In response to a letter from the Russian Ministry of Finance threatening liquidation because of undercapitalization, BJ Parent decided to alter the stock ownership of BJ Russia and have the new majority shareholder (Samotlor) transfer free cash to BJ Russia. There was no obligation to return the funds, and BJ Russia was not restricted in how it could use them. BJ Russia then decided to use the money to pay down an existing loan to BJ International, another subsidiary of BJ Parent. As a result, BJ Russia recapitalized its balance sheet, reducing its liabilities and increasing its net equity, thereby eliminating the net asset problem identified by Russian authorities. BJ Russia was thereby enabled to continue operations and complete the contract. Under these circumstances, the transfer of funds under the Free Financial Aid Agreement fits squarely

within the capitalization principle explained in *Fink* and specified in Treasury Regulation § 1.263(a)-2(f).

The Second Circuit reached a similar conclusion on analogous facts in *Mills Estate v. Comm'r,* 206 F.2d 244 (2d Cir. 1953). A New York law required a certain level of net assets before a corporation could make a corporate distribution. In order to undertake the transactions necessary to satisfy the net asset test, the taxpayer paid legal fees. The court ruled that legal fees incurred in the recapitalization effort were not deductible as ordinary and necessary business expenses. Given the non-deductibility of transactional costs associated with recapitalization, it is hard to fathom how a different result could be reached when (as here) the disbursement at issue is the recapitalization itself.

To be sure, BJ Parent did receive other benefits as a result of the recapitalization and reorganization effected by the Free Financial Aid Agreement. By helping BJ Russia avoid liquidation and finish the TNK-BP contract, BJ Parent assured not only that BJ Russia's valuable proprietary equipment and technology would be recovered, but also that BJ Parent's own reputation and future business operations would not be damaged. But these expected benefits were not realized solely, or even primarily, in the 2008-09 tax year. Instead, like any normal capital expenditure, these benefits to the taxpayer were expected to (and presumably did in fact) continue into the future, well beyond the tax year in which the payments were made.

Baker Hughes argues that the future benefits to BJ Parent's reputation and business operations do not preclude a current expense deduction here. It relies upon a line of cases

holding that, when one taxpayer pays the expenses of another, the payment may be deductible under § 162(a) if the taxpayer's purpose is to protect or promote its own business interests such as reputation and goodwill. *See Hood v. Commissioner*, 115 T.C. 172, 180–181 (2000); *Lohrke v. Commissioner*, 48 T.C. 679 (1967). This is a recognized exception to the general rule that a taxpayer may not deduct the expenses of another. As the Tax Court observed in *Lohrke*:

> In a number of cases, the courts have allowed deductions when the expenditures were made by a taxpayer to protect or promote his own business, even though the transaction giving rise to the expenditures originated with another person and would have been deductible by that person if payment had been made by him.

48 T.C. at 684-85.

The Government responds that, even under the *Lohrke* exception, the taxpayer's expenditure must be linked to an underlying current expense of the other business. In *Lohrke,* for example, the taxpayer sent a check to a third party customer to compensate for losses resulting from defective products sold by the taxpayer's corporation. *Id.* at 683. The other court cases cited by Baker Hughes reveal the same pattern—the expenditure at issue was earmarked to pay an obligation or extinguish a liability owed to a third party. *See Lutz v. Commissioner,* 282 F.2d 614, 615 (5th Cir. 1960) (individual taxpayer sought deductions for "amounts he paid and debts he assumed with respect to creditors of [] three corporations."); *Allen v. Commissioner,* 283 F.2d 785, 790 (7th Cir. 1960) (amounts paid "for the purpose of providing payment in full to [the corporation's] general creditors."); *Dunn & McCarthy v. Commissioner,* 139 F.2d 242, 243 (2d Cir. 1943) (corporate

taxpayer repaid loans made by company salesmen to its deceased president); *Pepper v. Commissioner,* 36 T.C. 886, 887 (1961) (taxpayer directly repaid third-party creditors $65,750); *Scruggs-Vandervoort-Barney, Inc.v. Commissioner,* 7 T.C. 779 (1946) (taxpayer reimbursed third-party bank depositors $240,888.31).

In reply, Baker Hughes disputes that a deductible underlying expense is necessary to invoke the *Lohrke* exception. It points to cases allowing a § 162 deduction for payments made by a shareholder to repay his corporation's debt to a third-party lender, even though the underlying loan was not a deductible expense of the corporation. *See e.g., Frazier v. Commissioner,* 34 T.C.M. (CCH) (1975). Yet the authority most heavily relied upon by Baker Hughes, a 1995 IRS Technical Advice Memorandum (No. 9522003), actually undermines its argument. The TAM restates the *Lohrke* exception in a manner fully consistent with the Government's position:

> A well-established exception to this general rule, however, permits taxpayers to claim a deduction for a payment made to extinguish another taxpayer's liability where the payment was made to protect and promote the payor's own goodwill *and is otherwise an ordinary and necessary business expense. Lohrke v. Commissioner*, 48 T.C. 679 (1967).

Dkt. 48-1, at 10. (emphasis added).[8]

---

[8] An IRS Technical Advice Memorandum is not binding precedent. *See Bombardier Aerospace Corp. v. United States,* 831 F.3d 268, 282 (5th Cir. 2016) (citing 26 U.S.C. § 6110(k) (3)). Even if it were, the factual circumstances described in the TAM No. 9522003 are materially different. A parent company had provided funding to pay debts owed by its subsidiary to non-shareholder creditors, in order that the subsidiary could be dissolved; the applicable law would not permit dissolution until all debts were paid. The TAM expressly noted that the payment was not intended to facilitate continued operations of the subsidiary, but rather to wind up those operations in a more orderly fashion. Dkt. 48-1 at 10. Here, BJ Parent was not providing funding so that BJ Russia might be shut down; to the contrary, it was infusing BJ Russia with sufficient additional capital to satisfy Russian regulations and continue business operations. *See Lidgerwood Mfg. Co. v. Commissioner,* 22 T.C. 1152 (1954) (corporate debt cancelled in order to facilitate continued operations held capital contribution).

Whether the *Lohrke* exception requires an underlying *deductible* expense, as opposed to a loan or some other type of non-deductible obligation to a third party, is apparently an unsettled question, but one that need not be reached here. The free financial aid provided by BJ Parent was untethered to *any* actual expense of BJ Russia, deductible or not. Given the unconditional nature of the aid, BJ Russia's decision to use some of the funds to pay down an intra-corporate loan is simply immaterial to the analysis. For these reasons, the *Lohrke* exception is inapplicable here.

## CONCLUSION

As the Supreme Court reminded in *INDOPCO, Inc. v. Commissioner*, income tax deductions are strictly construed because they are a "a matter of legislative grace." 503 U.S. at 84. When distinguishing capital expenditures from current expenses, the Code makes clear that "deductions are exceptions to the norm of capitalization," and so the burden of clearly showing entitlement to the deduction is on the taxpayer. *Id.* at 84; *Interstate Transit Lines v. Comm'r,* 319 U.S. 590, 593 (1943). Based on the summary judgment record, Baker Hughes cannot carry that burden here.

The court concludes, as a matter of law, that the $52 million transfer from BJ Parent to BJ Russia is not a bad debt deductible under 26 U.S.C. § 166; nor is it an ordinary and necessary expense of the taxpayer's business deductible under 26 U.S.C. § 162(a). Accordingly, Baker Hughes' motions for summary judgment (Dkt. 31, Dkt. 44) are **DENIED**, and the Government's motions for summary judgment (Dkt. 29, Dkt 43) are **GRANTED.**

A separate final judgment will be issued.

Signed at Houston, Texas on June 18, 2018.

_____
Stephen Wm Smith
United States Magistrate Judge